## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Sharon Joann Tanner,**

      **Plaintiff,**

      **v.**

      **Case No. 2:09–cv–866**

**Nationwide Mutual Insurance**
**Company, et al.,**

      **Judge Michael H. Watson**

      **Defendants.**

### OPINION AND ORDER

Plaintiff Sharon Joann Tanner filed this civil action after her employer,
Nationwide Mutual Insurance Company, acting through its Benefits Administrative
Committee, terminated her long-term disability benefits. The Court has jurisdiction to
hear this case under provisions of the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. §§1001 *et seq.*, and particularly 29 U.S.C. §1132(a)(1)(B).
The case is before the Court on cross-motions for judgment on the administrative
record (ECF Nos. 21 & 22) and the record itself (R., ECF Nos. 12 & 14) ("Record"). Ms.
Tanner, in her motion, asks the Court either to reinstate her benefits, which were
granted in April 2008 and discontinued in May 2009, or, in the alternative, to remand
the matter to Nationwide for further consideration of her appeal from the termination of
her benefits. For the reasons that follow, the Court **DENIES** Defendants' motion for
judgment as a matter of law on the administrative record (ECF No. 21) and **GRANTS**
Plaintiff's motion for judgment as a matter of law (ECF No. 22), and **REMANDS** this
case to Defendant for further consideration.

## I. FACTS

All of the pertinent facts in this case appear in the administrative record. Under *Wilkins v. Baptist Healthcare System*, "the district court [is] confined to the record that was before the Plan Administrator." 150 F.3d 609, 615 (6th Cir. 1998). The Court will summarize the pertinent portions of that record—particularly the medical evidence— here. The relevant portions of the long-term disability plan under which Ms. Tanner was first awarded, and then denied, benefits are set out in Section III below. The evidence summarized in this portion of the Opinion and Order is found in Part Two of the administrative record (ECF No. 14) which was filed under seal.

### A. Medical Records

The medical charts and reports contained in the Record appear to be dated from 2002 through 2009. The earliest reports include notes from an anterior cervical vertebrectomy and diskectomies with bone grafts and hardware placement done on May 25, 2002. The pre-operative and post-operative diagnoses were right greater than left cervical radiculopathy, secondary to disc protrusion C5-6 and C6-7 with cervical stenosis, C5-6 through C6-7. That surgery pre-dated Ms. Tanner's alleged date of disability by almost six years, and she was able to return to work after the surgery. (R. NW/Tanner 182–85).

In March 2005, as a result of an MRI of the cervical spine, Ms. Tanner was diagnosed with, among other conditions, central spinal canal stenosis at the C3-4 and C4-5 levels, as well as mild foraminal stenosis at C4-5. The canal stenosis was attributed to discogenic disease. There was also a spur evident on the right side at C6-7. A repeat study performed in November of that year showed multilevel disc

dessication and some disc bulging as well as some spondylosis at the C5-6 and C6-7 levels. (R., NW/Tanner 213–216).

Following those studies, Ms. Tanner was seen by Dr. Degenova at Grant Sports Medicine on February 15, 2006. At that time, she was reporting substantial neck pain which also radiated down her left arm. She noted some improvement from a recent injection but not from physical therapy. She also reported hand weakness and pain in the upper back area. After discussion of the procedure, Ms. Tanner agreed to a left C6-7 posterior cervical neural foraminotomy and decompression, and Dr. Degenova performed that surgery on March 14, 2006. The operation is also described as a "keyhole foraminotomy." On April 13, 2006, after the surgery, Ms. Tanner was doing very well, with no arm pain and only occasional tingling and numbness. She was released to return to work after therapy, which she apparently did, according to a treatment note dated June 21, 2006, which described her as "doing great." (R., NW/Tanner 207).

Dr. Degenova did not see Ms. Tanner again until May 2008. At that time, she reported doing well with the prior foraminotomy, but was having "horrible" neck pain radiating into her left shoulder, made worse by working. At that point she had been off work for two weeks and had applied for disability. On physical examination, she moved quite slowly and gingerly and exhibited tenderness along the left paravertebral muscles. Dr. Degenova recommended physical therapy and agreed to complete disability paperwork for her. (R., NW/Tanner 205–06). He saw her again several times in 2008 for complaints of back and foot pain, and at one point recommended epidural steroid injections for her back pain.

Ms. Tanner's family doctor at this time was Dr. Seidt. He also completed disability forms for her in 2008, indicating on one of them that she became totally disabled on April 18, 2008, not just from her job, but from any job. Dr. Seidt listed the disabling diagnoses as cervical degenerative disc disease and chronic back pain. In the narrative portion of the form, he wrote "Sharon has tried various work modifications and reduced schedules at work with no success. Very minimal amounts of physical labor sets [sic] her back. She is permanently disabled." (R., NW/Tanner 173–75). Dr. Seidt had completed a disability report the prior month that said essentially the same thing, and Dr. Degenova also completed a form indicating Ms. Tanner could never return to work. (R., NW/Tanner 142–48).

At Nationwide's request, Ms. Tanner was seen by Dr. Hannallah, an orthopedic surgeon, on November 3, 2008. Dr. Hannallah did this work under the auspices of an organization known as MLS National Medical Evaluation Services. He took a history from her which encompassed the two surgeries, the second of which did help with her radiculopathy. However, she said that she continued to have neck pain and had recently developed pain in her left leg. She had some moderate relief with steroid injections. Her symptoms also included occasional cramping of the hands, a two-year history of numbness and tingling in her left arm, and left arm weakness. She was taking thirteen separate medications, a number of which were for pain.

Dr. Hannallah performed a physical examination during which Ms. Tanner exhibited a good range of motion in her neck and good symmetric upper extremity strength and sensation with good reflexes. He also reviewed a number of medical records including the 2005 MRI studies and an August 2008 MRI of the lumbar spine

showing mild to moderate degenerative changes from L1 through S1. He did not have any records from either Dr. Degenova or Dr. Mayer, who performed the 2002 surgery. He stated after this examination and review that Ms. Tanner "has no objective weakness or changes in her neurologic exam. Her main complaint is of pain which I can neither refute nor substantiate." His report also noted that he did not have the benefit of any records from her treating physician and that he did not have enough information to express an opinion about whether Ms. Tanner was disabled as defined in the Plan because of the lack of "post-operative medical notes or imaging studies." He agreed that she "should refrain from vigorous activity involving her neck per her treating physician." (R., NW/Tanner 176–79).

Dr. Hannallah supplemented his first report on December 23, 2008. At that time, he had received and reviewed some additional reports, including a recent note from Dr. Seidt, records of the 2002 and 2006 surgeries, and an EMG report from July 29, 2008 showing mild ongoing L5 radiculopathy. He again observed that it was "difficult to answer questions about disability without access to the post-operative notes from the treating physicians and surgeons" but stated that Ms. Tanner "seems to be disabled secondary to pain." He indicated a willingness to review further records as they became available. (R., NW/Tanner 201–02).

Dr. Hannallah provided Nationwide with a third report on February 4, 2009. He provided the report in response to medical records which Nationwide had faxed to him the day before. The notes all came from Dr. Degenova; most related to the 2006 surgery and the follow-up care in the several months thereafter. Dr. Hannallah also had Dr. Degenova's May 1, 2008 report about Ms. Tanner's persistent neck pain and his

August 2008 notes relating to her back pain. Dr. Hannallah's only comments about the May 1, 2008 report were that it showed full strength in Ms. Tanner's upper extremities, a normal gait and normal reflexes, and that it noted a solid fusion from C5-C7. Dr. Hannallah did not refer to that portion of Dr. Degenova's report which described Ms. Tanner as having "horrible neck pain" made worse by working, any of the findings which indicated pain or tenderness, or the fact that Dr. Degenova agreed to complete paperwork for Ms. Tanner's disability claim.

Based on this additional record review, Dr. Hannallah provided answers to the questions which, in his first report, he was unable to answer, and which, in his second report, he appeared to answer favorably to Ms. Tanner. He stated that Ms. Tanner was not disabled because "[s]he has a solid fusion at C5-7, has good neurologic function." He made no comment about her pain level. He also repeated the admonition that she refrain from vigorous activity involving her neck. (R., NW/Tanner 232–35).

Dr. Seidt had the opportunity to review Dr. Hannallah's report and conclusions. In his response, he pointed out that "[w]hile Dr. Hannallah is correct that Ms. Tanners' [sic] condition is stable from a neurologic standpoint and with all likelihood will not be requiring any more surgery it does not address the fact that she suffers from severe, constant back pain on a daily basis. She is still very much dependent on chronic narcotics and any type of prolonged standing or sitting exacerbates her condition." Dr. Seidt reiterated his belief that Ms. Tanner was disabled. (R., NW/Tanner 240).

Shortly afterward, Ms. Tanner saw Dr. Degenova again. His office notes of February 24, 2009 indicate that she continued to report neck pain which also involved the left trapezius and left arm. The pain was affecting her ability to do housework, and

if she did do dishes or cook, she might spend the next several days in bed. Computer activity also caused fatigue. The physical examination showed decreased range of motion in the neck. Compression aggravated her pain. Dr. Degenova again concluded that she was disabled. (R., NW/Tanner 241–42).

Nationwide sought another opinion on Ms. Tanner's disability from Dr. Brenman, a doctor specializing in physical medicine and rehabilitation, and who, like Dr. Hannallah, was employed by MLS National Medical Evaluation Services. Dr. Brenman reported that he examined Ms. Tanner on March 17, 2009. He also reviewed a number of medical records, including the February 2009 reports of Drs. Seidt and Degenova. Ms. Tanner's subjective complaints included neck and left arm pain with associated hand weakness and back and leg pain. Movement and weather exacerbated her pain and she could not sit or stand for longer than twenty minutes, could not cook, could not open a jar, and could not lift "very much." She had also fallen recently and broken her wrist. Her medications included Duragesic, Percocet, Celebrex, Cymbalta and Neurontin. She walked somewhat slowly due to issues with balance. She exhibited tenderness along the cervical spine but had good range of motion with only mild discomfort. There was some decreased sensation along the left arm but muscle tone and grip strength were normal.

Like Dr. Hannallah, Dr. Brenman expressed the opinion that Ms. Tanner was not disabled. His reason appeared to be limited to the lack of objective findings adduced during his examination to support Ms. Tanner's ongoing subjective symptoms, although he also commented that are situations where a patient "unfortunately can still have pain not wholly explained" due to "failed surgery syndrome" or other conditions such as scar

tissue. It is unclear whether he concluded that Ms. Tanner had any of these conditions or whether she was actually experiencing the level of pain she described. Based on his examination, he also expressed the view that Ms. Tanner could work at the light physical demand level, and that heavier exertion could aggravate her neck or back condition. (R., NW/Tanner 243–51). Dr. Brenman was subsequently asked to comment about whether Mr. Tanner could engage in keyboarding activities and climbing ladders to pull files, and said that in his opinion she could perform those types of job duties with no restrictions. (R., NW/Tanner 256–57). Dr. Seidt also commented on her physical abilities, stating in a letter dated April 17, 2009, that she could not do a substantial amount of lifting, sitting, standing, keyboarding, training new employees, or computer work without experiencing pain. (R., NW/Tanner 109).

## B. Vocational Evidence

Nationwide also referred Ms. Tanner's case to a Vocational Rehabilitation Consultant, Lynne Kaufman, for "labor market access and earning capacity information." Ms. Kaufman was provided with the reports of Drs. Hannallah and Brenman as well as some records from Drs. Seidt and Degenova. She also had a description of the duties of Ms. Tanner's Senior Pensions Specialist job at Nationwide.

Ms. Kaufman rendered different opinions of Ms. Tanner's employability depending upon which of the various physicians' assessments were accepted. If Dr. Seidt and Dr. Degenova accurately reported Ms. Tanner's physical abilities, she would be precluded from all work. On the other hand, if Dr. Hannallah and Dr. Brenman were correct, Ms. Tanner could still do her job at Nationwide, and she could also do the job of "Financial Specialist, Other." Such jobs existed in substantial numbers in the central

Ohio area and paid from \$31,345.60 to \$58,905.60 annually. (R., NW/Tanner 258–62).

## C. Administrative Determinations

The decision discontinuing Ms. Tanner's long-term disability benefits was made

by Nationwide's Disability Assessment Committee. In a letter to Ms. Tanner dated May

29, 2009, the Committee explained that it had reviewed the Plan, the opinions of Drs.

Hannallah and Brenman, and the report from Ms. Kaufman. Based on those reports, it

found that she did not satisfy the Plan's definition of "long-termed disabled." Ms.

Tanner was advised of her appeal rights. (R., NW/Tanner 130–32).

Ms. Tanner appealed the decision to the Benefits Administrative Committee.

She submitted a number of medical records with her appeal. For essentially the same

reasons, and based on essentially the same documents, that Committee denied the

appeal on June 17, 2009, and communicated that denial to Ms. Tanner on June 18,

2009. (R., NW/Tanner 098–100).

## II. STANDARD OF REVIEW

This Court has previously articulated the standard of review which it uses in

cases involving either the denial or termination of ERISA benefits. As the Court said in

*Walborn v. Aetna Life Insurance Company*:

> District courts review a plan administrator's denial of ERISA benefits de
> novo, unless as is the case here, the benefit plan gives the administrator
> discretionary authority to determine eligibility for benefits or to construe the
> terms of the plan. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609,
> 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.
> 101, 115 (1989)); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d
> 444, 456 (6th Cir. 2003). When the fiduciary—in this case, Aetna—has such
> discretionary authority, its decision is reviewed under the "highly deferential"
> arbitrary and capricious standard. *Sanford v. Harvard Indus.*, 262 F.3d 590,
> 595 (6th Cir. 2001) (citing *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376,
> 380 (6th Cir.1996)). So long as the fiduciary's decision was "rational in light

of the plan's provisions", courts must uphold the denial of benefits when applying the arbitrary and capricious standard. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). In other words, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.*

\* \* \*

[H]owever, an additional element of the arbitrary and capricious standard of review is that an actual conflict of interest exists where the entity adjudicating the claim is also the entity responsible for paying the benefits. *Killian v. Healthsources Provident Administrators, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). This conflict does not, however, alter the standard of review. Instead, it becomes another factor in analyzing whether the plan administrator's decision was arbitrary and capricious. *See Firestone Tire & Rubber*, 489 U.S. at 115.

*Walborn v. Aetna Life Ins. Co.*, Case No. 2:09–cv–532, 2010 WL 3672332, \*2–3 (S.D.

Ohio Sept. 17, 2010).

Here, the applicable plan language comes from Article IX of Ms. Tanner's benefit

plan (the "Nationwide Insurance Companies and Affiliates Plan for Your Time and

Disability Income Benefits"), which is found at pages NW/Tanner 001 through

NW/Tanner 080 of Part One of the Administrative Record (ECF No. 12). Specifically,

Article IX, Section 9.04, provides in pertinent part:

> The Plan Administrator has the power to take all actions required to carry out the provisions of the Plan and further has the following powers and duties, which will be exercised in a manner consistent with the provisions of the Plan:
>
> (a) To exercise discretion and authority to construe and interpret the provisions of the Plan, to determine eligibility to participate in the Plan, and make and enforce rules and regulations under the Plan to the extent deemed advisable;
>
> (b) To decide all questions as to the rights of Participants under the Plan and such other questions as may arise under the Plan;

* * *

(e) to determine the amount, manner, and time of payment of benefits hereunder, including the ability to offset any benefit overpayment that has not been repaid or collected in some other manner against any benefit payment to which an Eligible Associate or beneficiary may become entitled under this Plan; [and]

* * *

(h) To do such other acts as it deems reasonably required administering the Plan in accordance with its provisions, or as may be provided for or required by law.

(R., NW/Tanner 58–59).

Nationwide argues, and Ms. Tanner agrees, that this language confers broad

discretion on the Plan Administrator to make benefit decisions and that it is legally

sufficient to limit the Court's review of benefit decisions to whether they are "arbitrary

and capricious." *See* Def.'s Mot. J. Admin. R. 6, ECF No. 21; Pl.'s Mot. J. Admin. R.

12, ECF No. 22. Other courts construing the same or similar language from

Nationwide's employee benefit plans have used the same standard of review. *See,*

*e.g., Anderson v. Nationwide Mut. Ins. Co.*, 592 F. Supp. 2d 1113, 1125 (S.D. Iowa

2009); *Doyle v. Nationwide Ins. Cos. and Affiliates Emp. Health Care Plan*, 240 F.

Supp. 2d 328, 335 (E.D. Pa. 2003). Therefore, the Court will review Nationwide's

decision in this case under the "arbitrary and capricious" standard of review.

## III. DISCUSSION

Ms. Tanner was initially awarded long-term disability benefits effective April 21,

2008. The Plan, in Section 1.34, which is part of "ARTICLE I – Definitions," defines

Long-Term Disability in the following way:

1.34 – LTD Disability or LTD Disabled

"LTD Disability" or "LTD Disabled" means a disability or disablement that

results from a substantial change in medical or physical condition as a result
of Injury or Sickness and that prevents an Active Associate from engaging
in Substantial Gainful Employment for which she is, or may become,
qualified.

This definition refers to another defined term, "Substantial Gainful Employment." That
phrase, according to Section 1.60 of the Plan, means:

1.60  Substantial Gainful Employment

"Substantial Gainful Employment" means:

(b) For Active Associates who are Eligible Statutory Employees, any
occupation or employment from which an individual may receive an income
equal to or greater than one-half of such individual's pre-disability income.

The parties appear to agree that any employee who is capable of returning to his or her

past job with Nationwide does not meet the definition of someone with a long-term

disability. The issue here is whether Nationwide's decision that Ms. Tanner can either

return to her job, or do other jobs falling within the Plan's definition of "Substantial

Gainful Employment," is arbitrary and capricious.

It is somewhat difficult to conceptualize the arguments advanced on behalf of

Ms. Tanner in the two memoranda which have been filed. Taken together, they

represent somewhat of a "scattergun" approach to the issues, raising questions ranging

from the ultimate issue of whether the decision to terminate benefits was arbitrary and

capricious to matters such as whether the Plan Administrator was entitled to credit the

opinions of an examining doctor who referred to Ms. Tanner with a masculine pronoun

or the views of a vocational consultant who works from home. The Court will attempt to

organize its discussion around the more germane questions, however, and will discuss

each of them separately. Clearly, two of the key issues in this case are the

Committee's disregard of the opinions of Ms. Tanner's treating physicians, Drs. Seidt
and Degenova, and its reliance on the fact that the objective medical evidence does not
directly support (but also does not directly contradict) Ms. Tanner's subjective reports of
disabling pain.

## A. Treating Physicians and Subjective Complaints

The weight given to the opinion of a long-time treating physician, as opposed to
the views of a one-time examining physician, is a common issue in ERISA benefit
cases. A number of courts, and particularly the Court of Appeals for the Ninth Circuit,
analogized ERISA benefits cases to social security disability appeals and borrowed the
"treating physician" rule from this latter type of case. That rule, generally speaking,
requires that significant or even controlling weight be given to the opinion of a treating
physician unless good reasons exist for according less weight to that opinion, and that
the administrative decision has to articulate with specificity the reasons for not
according significant weight to the treating source's views. *See, e.g., Rogers v. Comm'r
of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007); 20 C.F.R. §404.1527(d).

In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), the Supreme
Court made it clear that this rule does not apply equally to ERISA disability cases. As
the Court explained,

Nothing in the Act itself, however, suggests that plan administrators must
accord special deference to the opinions of treating physicians. Nor does the
Act impose a heightened burden of explanation on administrators when they
reject a treating physician's opinion.

*Id*. at 831. The Court held that if this type of rule is to be applied in the ERISA context,
it must come from either a legislative or administrative enactment and not from the

judiciary's view of whether such a rule furthers the purposes of ERISA. However, the Court did not prohibit a reviewing court from applying the applicable standard of review to the way in which the plan administrator dealt with an opinion from a treating physician, noting that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. *See also Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) ("a plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician"); *Curry v. Eaton Corp.*, Case Nos. 08-5973, 08-6369, 2010 WL 3736277, *8 (6th Cir. Sept. 20, 2010) ("Giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious").

*Evans* is particularly helpful in determining when a plan administrator's disregard of the opinion of a treating physician can be considered arbitrary. The *Evans* court cited with approval several other decisions where that conclusion was reached. One situation is where the evidence from the treating physicians is strong and the opposing evidence is equivocal, at best, and also lacking in evidentiary support. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Another is where the contrary opinion of the non-treating physician was not based on an examination of the claimant and was supported only by a selective, rather than a fair, reading of the medical records. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Arbitrary decisions may also include ones which accept a file reviewer's disregard of subjective reports of symptoms based solely on a review of medical records which do not contain objective support for the claimant's complaints, *see*

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), and ones relying on an expert opinion that does not address crucial aspects of the claimant's former job and which is in conflict with other credible evidence in the record, including the opinion of the treating source. *See Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005).

Another issue which commonly arises in the disability context is how to treat a claimant's subjective report of disabling symptoms (usually pain). Many times, the extent of a claimant's pain is not directly ascertainable from the objective medical evidence, such as the results of x-rays, MRIs, CT scans, or EMGs. Again, in the social security disability context, the case law and regulations set out a systematic way of addressing that issue. There, a two-step inquiry is required. First, does the claimant have a medical condition which is capable of causing the symptoms being reported? Second, if so, is there other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors which either supports or detracts from the claimant's subjective complaints? *See Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 853 (6th Cir. 1986); 20 C.F.R. §404.1529. These concepts, while not directly applicable to ERISA cases, are useful in examining the reasons why a plan administrator may have rejected a claimant's subjective complaints of pain and whether those reasons are arbitrary.

There are some types of impairments which are almost impossible to document and which therefore present claimants with an opportunity to claim disability based on little more than self-reported symptoms. In such cases, it seems clear that "subjective

complaints of back pain by themselves do not compel an administrator to grant disability benefits." *Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 174 (6th Cir. 2007) (Sutton, J., concurring in part and dissenting in part) (citing, *inter alia, Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996)). Judge Sutton also pointed out, however, that a plan administrator's failure to use a "'deliberate, principled reasoning process'" in such cases, which necessarily includes dealing with the difficult issue of how the objective medical evidence relates to the subjective report of disabling symptoms, usually leads to the conclusion that the decision under review was reached in an arbitrary manner. *See id.* (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

Especially when an issue exists as to the credibility of a claimant's subjectively-reported symptoms, the plan must follow reasonable procedures in deciding that issue. So, for example, "credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 395–96 (6th Cir. 2009); *see also Calvert v. Firstar Fin., Inc.*, 409 F.3d at 296–97 (conclusion that a claimant had subjectively exaggerated her symptoms was "incredible on [its] face" when physician reaching that conclusion never examined the claimant). That is particularly true when there is, in fact, objective medical evidence of the underlying condition which forms part of the basis of an opinion that a claimant is disabled due to pain, and the plan administrator performs a selective, rather than comprehensive, review of the records in reaching the opposite conclusion. *See, e.g. Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 739–40 (S.D.

Ohio 2010) (where the record contained evidence of physical conditions which could reasonably cause pain, it was a "complete misreading of the medical records . . . to say that Plaintiff's complaints of pain or weakness . . . are subjective and unverifiable").

## B. The Decision under Review

There is no question that, in this case, by basing their opinions almost exclusively on the absence of objective medical findings, Drs. Hannallah and Brenman made a finding that Ms. Tanner's subjective report of disabling symptoms, which was credited by her two treating doctors, was not credible. *See Mennucci v. Hartford Life and Acc. Ins. Co.*, Case No. 2:09–cv–900, 2010 WL 4642919, *9 (S.D. Ohio Nov. 9, 2010). Therefore, the cases dealing with that issue are pertinent here. It also appears to be true that neither the final administrative decision nor the initial administrative decision contains any analysis of the medical evidence or of Ms. Tanner's subjective report of symptoms beyond that contained in the reports of Drs. Hannallah and Brenman. The decision under review is, of course, the one issued by the Benefits Review Committee, and it appears to track an analysis of the case written by Mary Miller, Secretary to the Committee. The Court believes it is essential to describe these documents in detail, particularly because the Court has come to the conclusion that its review of the substance of the Plan's final decision must be based on something other than the administrative decisions themselves.

Ms. Miller, in her case analysis, describes what evidence was considered by the Disability Assessments Committee, and she also describes the evidence submitted by Ms. Tanner's counsel as part of the appeal. The latter evidence consists of only four reports written by Dr. Seidt, all from late 2008 or 2009 (none of which is an actual

medical record) and one operative report from Dr. Degenova (his October 17, 2008

report of one lumbar epidural steroid injection, *see* R. NW/Tanner 113–14, which has

no relationship to Ms. Tanner's cervical spinal disease). In the "research" section of the

memorandum (R., NW/Tanner 101–02), the memorandum discusses certain reports

from Drs. Hannallah and Brenman and the vocational report from Ms. Kaufman, and

states that these reports were the *only* matters considered by the Disability Assessment

Committee; Ms. Miller's exact wording is that "The DAC terminated Ms. Tanner's LTD

benefits based on the results from the following: Independent Orthopedic Medical

Examination by Dr. Hannallah on 11/3/08 . . . ; An Independent Physical Medicine and

Rehabilitation Medical Evaluation by Dr. Brennan [sic] in 3/17/2009 to evaluate her

chronic pain . . . ; [and Ms. Kaufman's report]". Finally, the memorandum contained a

section entitled "PLAN'S REASON FOR DENIAL" which sets forth no reasoning specific

to Ms. Tanner's case, but which simply recites language from the Plan's definition of

disability. Two members of the Benefits Review Committee initialed the report

signifying their approval.

The only substantial difference between that report and the final decision sent to

Ms. Tanner on June 18, 2009, is the inclusion of one additional piece of information in

the description of what the Committee considered ("Information Contained in Disability

Case Management Notes") which, as worded, does not refer to any specific portion of

the record. Again, at least as far as the medical basis for the decision is concerned, the

only reasoning contained in the decision consists of a summary of the conclusions of

the November 3, 2008 report from Dr. Hannallah and the report of Dr. Brenman. It is a

fair inference that these conclusions were adopted wholesale by the Committee since

there is no other explanation articulated for the denial of benefits. These summaries are identical to those contained in the decision of the Disability Assessments Committee from which the appeal was taken, and it, too, does not articulate any independent basis for the decision, nor does it discuss (or even acknowledge) the existence of any other evidence. Thus, in order for the Plan's decision to pass muster under the arbitrary and capricious standard of review, the conclusions reached by Dr. Hannallah and Dr. Brenman must independently meet that standard, because the Plan appears simply to have adopted their reports and conclusions as its own.

It is fairly easy to dismiss Dr. Hannallah's November 3, 2008 opinion as an important part of this analysis. When asked on that date the key question "is it your opinion that this paerson [sic] is LTD disable [sic]," he responded by saying "I do not have enough information to answer this question with out [sic] reviewing any post-operative medical notes or imaging studies." (R., NW/Tanner, 179). He also stated that "[h]er main complaint is pain which I can neither refute nor substantiate." It would clearly be arbitrary and capricious to have relied upon that report as evidence of a lack of disability, especially given that the only other medical evidence in the record up to that date all supported a finding of disability (and, in fact, had been accepted by Nationwide as proof of disability because Ms. Tanner was receiving benefits as of that date). Although Dr. Hannallah did submit two more reports, those were not cited in either of the administrative decisions, so it is a moot issue as to whether they might have provided additional support for those decisions. Thus, the analysis essentially comes down to Dr. Brenman's opinion.

Dr. Brenman claimed to have based his opinion on the following information:

(1) the results of his physical examination, and (2) what appear to be all, or the majority of, the other medical records in the file, including all three written opinions from Dr. Hannallah. At least, those are listed among the records he reviewed. In his report, Dr. Brenman accurately summarized the medical records, including those which favored Ms. Tanner's claim of disability. He also recounted Ms. Tanner's subjective claims, including her statement that she could not sit for more than 15 or 20 minutes without neck and shoulder pain, and the results of his examination, which did demonstrate some pain, particularly in the cervical and thoracic regions. In the narrative portion of the report, however, he does not express any opinion about the validity of her statements or the reliability of any of the other medical opinions which appear in the record.

The crux of Dr. Brenman's opinion is contained in his response to the same question which Dr. Hannallah could not answer, namely whether Ms. Tanner's condition met the Plan's definition of disability. After answering "no" to that question, Dr. Brenman supplied this rationale:

> In my medical opinion, no he [sic] does not meet the criteria for LTD disabled as outlined above. The claimant has no objective findings to support the claimant's ongoing subjective symptoms. The claimant unfortunately can still have subjective pain, particularly with some nerve irritation that can give the claimant pain down the left upper limb after surgery, but she reports that she did improve after having anterior and posterior surgery. There is a phenomenon called "failed surgery syndrome" where patients unfortunately can still have pain not wholly explained, but the claimant can still have irritation of a nerve root possibly from scar tissue or a "central windup" that could give the claimant subjective symptoms.
>
> However, the claimant has no active neurological findings. There is no active surgical lesion in the cervical spine. The claimant has only mild changes according to the MRI report at the L3-L4 central canal and foraminal levels of the L3-L4 and L4-L5 levels. Due to the fact that on my examination today

> there is a lack of objective findings to support the claimant's ongoing
> subjective symptoms, in my medical opinion the claimant is not a candidate
> for "LTD disabled."

R., NW/Tanner 249. Dr. Brenman added, in response to a different question, that "the

claimant can work in the light physical demand level," (R., NW/Tanner 250), but that

opinion is clearly dependent on his earlier response that Ms. Tanner does not meet the

Plan's definition of disabled, and there is no additional reasoning supplied to support

that response. Thus, the question becomes whether this explanation for the

termination of Ms. Tanner's long-term disability benefits—which was clearly adopted

wholesale by the Plan's disability review committees—comports with the applicable law,

or whether it can be properly characterized as "arbitrary and capricious."

## C. Is the Plan's Decision Arbitrary and Capricious?

It is clear that on the two related issues of how much to credit the statements of

Drs. Seidt and Degenova, and how to evaluate Ms. Tanner's subjective reports of

disabling symptoms, Dr. Brenman gave little weight to either. His opinion is not without

its ambiguities on these issues.

As to Ms. Tanner's credibility, Dr. Brenman does not state directly that Ms.

Tanner was exaggerating her symptoms or malingering (and there is no suggestion

from the notes of his examination that he observed any evidence of either), nor does he

state directly that she is not actually experiencing the pain she reported. In fact, he

notes that patients who undergo the types of procedures described in the records can

actually continue to have pain that lacks a specific physical explanation, such as what

he referred to as "failed surgery syndrome." He does not indicate that those are not

real occurrences in the medical world or that anyone claiming to suffer from such
maladies is exaggerating or malingering. Consequently, it is difficult to know if he
actually found Ms. Tanner not to be credible, or if he had some other basis for
concluding that even if she was credible, she was not entitled to benefits.

Related to that issue, of course, is his analysis of the reports of Drs. Seidt and
Degenova to the effect that Ms. Tanner is disabled. It is fair to conclude that both of
those doctors formed their opinions from a combination of the results of the medical
tests and procedures they performed, the length of their treatment history with Ms.
Tanner, and her consistent report of disabling symptoms. Dr. Brenman did not actually
comment on their opinions at all, nor did he provide any explanation either of the weight
he gave them (which, of course, is not strictly required here, see Black & Decker, supra)
or whether he took them into account at all, beyond listing them as documents he
reviewed. It does not appear that he disagreed with any of their diagnoses. Rather, it
appears that he simply drew his own conclusions from looking at the same objective
evidence (test results, surgery notes, x-ray or MRI studies, and the like) and from the
findings he noted when he performed his examination of Ms. Tanner.

What is clear from Dr. Brenman's rationale is that he made every effort to
confine his opinion to what he described as the "objective" findings. Again, while not
denying that there are patients who suffer from pain that cannot be completely
explained by objective findings, and that Ms. Tanner does have medical conditions
which can cause the type and severity of pain she described, he concluded that he
could not verify her complaints of pain strictly from a review of the objective evidence.
That becomes very apparent from the second paragraph of his rationale, where he

states that there are no "active neurological findings," no "active surgical lesion" in the neck area, and that only "mild" changes in the lumbar spine appear on her MRI. These observations, plus the lack of objective findings from that day's physical examination, led him to the opinion that she did not qualify for disability benefits under the plan.

Before completing the analysis of whether that opinion is arbitrary and capricious when viewed against the record as a whole, it is helpful to review again the operative plan language. The applicable provision, Section 1.34, which is quoted more fully above, does not use the phrase "objective medical evidence." Indeed, it does not contain the word "objective." The Court has not located any other pertinent provision of the Plan that includes this language or relates it to what constitutes acceptable evidence of a disabling condition. Thus, the phrasing of Dr. Brenman's conclusion certainly raises some question about whether he has read a requirement into the Plan which is not there, and then used that non-existent requirement as a basis for concluding that Ms. Tanner does not meet the Plan's definition of "long-term disabled."

The issue of whether, and to what extent, a disability applicant must come forward with "objective" evidence to support his or her claim is not an uncommon one in ERISA litigation, but it usually arises because the applicable plan contains such a requirement. *See, e.g. Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x 469, 472 (6th Cir. Dec. 20, 2005) (construing plan language which required the claimant to submit "objective medical evidence in support of a claim for benefits"). Some courts have concluded that to insist on such evidence in the absence of specific plan language can be grounds for reversal. *See, e.g., Pelchat v. UNUM Life Ins. Co. of America*, Case No. 3:02–cv–7282, 2003 WL 21105075, *11 (N.D. Ohio March 25, 2003) (it is arbitrary

and capricious for the plan administrator to impose an "objective medical evidence"
requirement when the plan itself does not); *see also Crist v. Liberty Life Assur. Co. of
Boston*, Case No. 3:04–cv–10, 2006 WL 1209350 (S.D. Ohio May 4, 2006).
Nevertheless, it is also true as a general matter, even in the absence of this specific
language, that "[r]equiring a claimant to provide objective medical evidence of disability
is not irrational or unreasonable." *Cooper v. Life Ins. Co. of North America*, 486 F.3d
157, 166 (6th Cir. 2007). Still, it is one thing to insist that some objective evidence of a
potentially disabling condition be *submitted*—and here, the file is replete with objective
evidence documenting both Ms. Tanner's cervical spinal disease and her lumbar spinal
disease—and another to insist that the objective evidence be *sufficient* to resolve all of
the issues in the case, including the amount of pain being experienced by the claimant.
If that were a permissible interpretation of this plan, no claimant with a condition which
*can* cause disabling pain, but which sometimes does not, could ever qualify for disability
because the objective tests rarely, if ever, precisely quantify the amount of pain which
any particular individual is suffering.

What is, then, the proper role played by the type of objective evidence presented
here? Certainly, it must have some impact on the administrative decision; after all, plan
administrators are not required to accept either a claimant's report of disabling pain or a
treating doctor's opinion of disability at face value, and the administrators may take into
account the objective medical evidence which, under *Cooper*, it is reasonable for them
to request. However, it seems equally clear that a plan administrator may not use the
absence of definitive objective evidence on the issue of the extent of the claimant's pain
as the sole reason for denying benefits. Rather, there must be some reasonable, as

opposed to formulaic, balancing of the evidence performed, which gives due and appropriate consideration to every relevant fact—the treating physicians' views, Plaintiff's claimed pain, the relationship of the objective testing to both of these matters, and the presence or absence of other factors which would impugn Plaintiff's credibility—before the absence of objective evidence of disabling pain, *in and of itself*, can be used as the determinative factor.

That type of balancing and fair consideration of the entire record is not apparent here. The two administrative committees which first ordered, and then upheld, the termination of Ms. Tanner's disability benefits, simply adopted in its entirety, and as their own decision, the report submitted by Dr. Brenman. Dr. Brenman, in turn, appears to have made a legal determination that unless a claimant can produce objective evidence to support not only the existence of a potentially disabling medical condition, but the severity of her symptoms, that claimant cannot qualify for benefits. He does not appear to have made any credibility determination about whether Ms. Tanner was actually experiencing the level of pain she reported—and he noted that some people with her conditions do, for reasons which medical tests cannot entirely explain—nor did he provide any reasoned basis for discounting the opinions of Drs. Seidt and Degenova beyond the fact that, again, the objective tests they performed did not fully document Ms. Tanner's claimed symptoms.

As the cases cited above have repeatedly held, while a plan administrator need not accord controlling weight to a treating doctor's opinion, the failure to deal with that opinion at all can be one factor in determining that the plan's decision is arbitrary rather than reasoned. That conclusion is only buttressed by the strong possibility that the

doctor to whom the plan apparently delegated responsibility to interpret the key plan language may well have done so incorrectly, and may not have realized either that subjective pain reported by a credible claimant, accompanied by objective evidence of significant conditions that can produce pain in some number of patients with those conditions, can qualify a claimant for disability, or that he was expected by the plan administrators to provide a reasoned determination of the claimant's credibility and the validity of her treating doctors' views. This combination of factors persuades the Court that the Plan did not, as is required even under the "arbitrary and capricious" standard of review, provide "a reasoned explanation, based on the evidence, for [the] particular outcome" in this case. *See McDonald*, 347 F.3d at 169. Thus, Ms. Tanner is entitled to a remand of the case so that the deficiencies in the decision-making process identified in this Opinion and Order can be addressed by the Plan. *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) ("the appropriate remedy [where a claimant is not clearly entitled to benefits] is to remand to [the plan administrator] for a full and fair inquiry . . . .").

## IV. DISPOSITION

Based on the above, the Court **DENIES** Defendants' motion for judgment as a matter of law on the administrative record (ECF No. 21) and **GRANTS** Plaintiff's motion for judgment as a matter of law (ECF No. 22). This case is **REMANDED** to Defendant for further consideration of the evidence and for the purposes of rendering a decision free of the errors identified in this Opinion and Order. The Clerk shall enter final judgment in this case in favor of Plaintiff and against Defendants. The Clerk shall remove documents ECF No. 21 and ECF No. 22 from the Court's pending motions list.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**